## Carpenter v. Carpenter et ux.

Feb. 19, 1943.

318

Gardner & Gardner for appellant.

Nickell & Nickell for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Reversing.

The appellant and defendant below, D. F. Carpenter, is the son of the appellees and plaintiffs below, Joe L. Carpenter and wife. Plaintiffs owned a cheap farm containing about 50 acres in Morgan county, Kentucky, at the time of the transactions here involved, upon which they resided and reared a family of six children from the time they acquired it in 1887. For a considerable time prior to December, 1936, when the transactions here involved first arose, five of plaintiffs' children had married and moved away from the farm upon which they were born and reared; except defendant, who was then about 34 years of age and who continued to reside with his parents and contributed largely to their support and maintenance with the proceeds of the farm, supplemented by wages earned and received at other work.

On the 12th day of February, 1937, a paper was acknowledged before Thomas Cox, then county court clerk of Morgan County, purporting to be a deed executed by plaintiffs to defendant, their son, conveying to the latter their farm. The consideration therein expressed was $1, the payment of which was acknowledged, and that "Joe L. Carpenter and Martha Carpenter were to have their support and maintenance by protection of said lands," which, no doubt, was intended to provide for support and maintenance of the vendors by the vendee for the remainder of their respective lives, and which appears to have been so construed by the parties.

Considerably prior to that time defendant kept and cohabited with one Dora Hale, by whom he had six children before marrying her in September, 1937. The 1936 deed (to which we will hereafter refer as the "first deed") was purportedly acknowledged on February 12,

1937, and shortly thereafter it was put to record. The other heirs—most of whom resided in the same general neighborhood—soon learned of its execution and became considerably infuriated, so much so that harsh words passed between some of them and defendant, their brother, as vendee in the deed—they claiming that he forbad them to come around the premises, but which defendant denied. He admitted, however, that he did forbid his brother, Hollie Carpenter, from visiting the premises for the purpose of accusing him of wrongfully procuring the execution of the deed; but that he never forbad any of his brothers or sisters, or any members of their families, visiting him and their parents on the premises in a peaceful and affectionate temper. However, the dissatisfaction and anger produced by the execution of that deed finally resulted in defendant being arrested on a warrant issued by the county judge, but the crime with which he was charged in the warrant nowhere appears in the record, though it is intimated that it was an accusation of forging the 1936 deed. Nevertheless it remained, on record, without any court action on the part of plaintiffs to cancel it, until this action was filed by them in the Morgan circuit court on May 19, 1941.

After its execution defendant continued to live on the farm with his parents, cultivating it, but when his labor was not required for that purpose he earned wages working at other jobs in the neighborhood, the chief ones being farm labor for a neighboring farmer, and on WPA work nearby. The evidence clearly establishes that he was an indefatiguable worker and supplied his parents with all the necessities of life, except that he bought for them only a limited amount of clothing, due to the fact that they were already supplied with such articles. At the time the first deed was executed Dora Hale, with her six illegitimate children by defendant, was living in a tenant house on the farm, and defendant's mother objected to signing that deed unless defendant would move her from the premises, which he agreed to and did do by renting another residence in the immediate neighborhood as a residence for his concubine and his illegitimate children by her. He at the same time took up his abode at that rented residence, but continued to work and look after his parents as he had theretofore done. For two of the years he worked the farm, after the execution of the first deed, his crop was destroyed by floods,

but his courage was not destroyed and he continued to labor for wages with which to meet his obligations.

Defendant remained in jail, after being arrested, for some twelve days, when the county judge, at the request of his father, dismissed the charge against him and he returned home. Following his return his parents appear to have repented, not only because of the criminal charge preferred against their son, but likewise because of their objections to his associations with and marriage to Dora Hale, and they requested him to move his family from the rented residence into that occupied by the parents, which was done. The oldest of the illegitimate children was about 20 years of age; the next one about 18, and the others ranged down to as low as 3 years. The 18 year old child was a girl and she left home and moved to Chicago, Illinois, where she obtained work. The next youngest girl was 13 years of age and she remained at home. In 1938 or 1939 Dora Hale Carpenter died, but the household affairs were performed thereafter substantially in the same manner as theretofore.

The mother of defendant was then slightly above seventy-five years of age, and was subject to occasional "sick headaches" which would not linger long, and she was able to and did willingly assist in cooking, doing some washing and other duties pertaining to household management. She was assisted by defendant, and by those of his children who were large enough to render such services. However, all outdoor work, such as feeding the stock, providing fuel wood, etc., was done mainly by defendant, although his father assisted to some extent in preparing wood for the fireplace. As we have said, the first deed contained an obligation on the part of defendant to support and maintain his parents.

The father was considering applying for an old age pension, but the obligation of his son to support him and his wife during their lives he regarded, or thought, was an obstruction to his obtaining the pension. Defendant stated that it was for that reason that a second deed was executed between the same parties and for the same purpose on April 20, 1940, in which it was stated that "This deed is to take the place of a former deed bearing date February 12, 1937, deeded to D. F. Carpenter by Joe L. Carpenter and Martha E. Carpenter;" but there was not contained in that deed any obligation on the part of defendant to support his parents in the manner set forth

in the first deed. The last deed will be referred to as the "second deed."

On April 14, 1941—six days less than one year from the date of the second deed—plaintiffs left their home then occupied by themselves and the defendant and five of his children, and went to the home of one of their other children in the same vicinity. They thereafter visited other children in the same neighborhood followed by their filing this action twenty-five days after they left their home. In their petition they charged that the first deed referred to was a forgery, for which reason they sought its cancellation, and likewise sought a reformation of the second one by inserting therein the provision for their support during their lives, as was contained in the first deed. They then sought cancellation of the second deed (after being so reformed) because of defendant's alleged failure to comply with his obligations to support them. The answer was a denial of all the material allegations of the petition, except defendant admitted that the second deed was based upon the consideration of support for his parents as they alleged in their petition. However, defendant insists that it was not omitted by any mutual or other mistake or by any fraud perpetrated by him, since it was understandingly omitted from the second deed—presumably, as we conclude —to remove all obstructing effect it might have in the obtention of an old age pension by the father.

Defendant furthermore counterclaimed in his answer for services rendered to his parents up to the date when they departed from their home, less the value of the use of the premises that had been deeded to him. After evidence taken by both sides and submission of the cause, the court adjudged the cancellation of the first deed, the reformation of the second one and then cancelled it, and gave to defendant on his counterclaim judgment for $125. From that judgment defendant prosecutes this appeal. Since the filing of the appeal plaintiff Joe L. Carpenter died, and the appeal has been revived in the names of his heirs.

The contention made in the petition that the first (1936) deed was forged is exceedingly doubtful from the testimony on that issue; but, however that may be, it was superseded by the second (1940) one, and which was expressly so stated in the latter. No attack was

made on it, except to reform it in the respect indicated so as to conform to the facts which defendant admitted. But it is also extremely doubtful if such omission (as above stated) was the result of either fraud or mutual mistake, so as to authorize reformation, but nevertheless we shall determine the appeal from the standpoint of the rights of the parties under the second deed, as reformed by the court; which conclusion eliminates all of the issues involved in the litigation, except the contention (made a ground for cancellation in the petition) that defendant failed and refused to perform the consideration for the second deed. If he did so fail and refuse, then plaintiffs possessed the right to its cancellation on equitable terms, as was expressly held in the cases of Luster v. Whitlock, 203 Ky. 405, 262 S. W. 572, and Maddox v. Maddox, 135 Ky. 403, 122 S. W. 201.

The ground of non-performance may be divided into two divisions (a) actual refusal of defendant to comply with the terms of the deed, and (b) inability financially or otherwise to render performance. As to the first fact, (a), the record practically furnishes no proof to sustain it. On the contrary, both plaintiffs testified to the valiant efforts made by defendant to comply with the terms of his contract, and practically no complaint was made by them of any such failure up to the time of the death of defendant's wife, who, herself, conducted and managed the household affairs until a short while before she died. After that time defendant appears to have rendered personally more household services and performed more chores in that regard than he had theretofore done. He was assisted by his children who were old enough to render such services, and by some hired help, but on occasions defendant's father would, as hereinbefore stated, prepare wood for fuel purposes from the woodyard, and defendant's mother would also occasionally do washing—chiefly for herself—and she likewise aided in the cooking, most if not all of which was done by her following the death of defendant's wife.

But, however that may be, we do not construe the terms of the contract alleged to have been violated by defendant to mean that his parents should constantly sit with folded hands, nor that he should be visited with the penalty of forfeiture of his deed, because, forsooth, the grantors upon occasions would render some service toward fulfilling the obligations that he had assumed—

especially if done by them willingly, rather than for others to do so for them.

In the Luster case supra—the facts of which are very analogous to those appearing in this case—we said: "As is usual in cases of this character the evidence is conflicting, but it reasonably appears that Mrs. Luster furnished her aunts such accommodations *as the contract contemplated.*" (Our emphasis). No great amount of clothing was furnished by defendant to either of his parents, but they appear to have made no complaint with reference thereto, and defendant testified—which was undenied so far as we are able to discover—that they were already supplied with the necessary clothing, and that he never failed to supply anything that either of them requested. Indeed, both parents expressed no complaint of a lack of effort on the part of defendant to comply with his contract, save and except his mother intimated in her testimony a violation of the contract because of sparsely furnished clothing to her by her son.

The contract—at least by implication—obligated defendant to treat his parents with respect and due consideration, and they testified that on occasions he talked to them more or less roughly and also refused to permit their other children to visit them at their home, which, no doubt, if true would constitute a breach of the contract. But the testimony fails to disclose when the alleged improper conduct towards his parents occurred, i. e., whether before the execution of the second deed or afterwards. If it occurred prior to that time then it was condoned by the execution of that deed and could not be considered as grounds for cancelling it. However, defendant denied such conduct on his part, especially to the extent claimed by his parents, and they continued to live together thereafter. Even if defendant on sparse occasions following the second deed so deported himself towards his parents to the extent they testified, it is doubtful if it would furnish grounds for its cancellation in the light of the surroundings and environment of the parties resulting from the burdens defendant was carrying including the humiliation he was enduring because of his early entanglement with the woman he eventually married, plus loss of respect—to say nothing of affection—by his brothers and sisters growing out of the fact that his and their parents had executed to him a deed to the land. The frailties of human nature causes it to some-

times explode, and to be followed in calmer moments by repentance. This seems to have been true with defendant, and courts should be reluctant to take from such a one so circumstanced, the well earned fruits of dutiful care and attention to his parents, which defendant had done for a long period of service that no other child of plaintiffs appeared willing to undertake.

With reference to the charge that defendant refused to permit his brothers and sisters to visit their common parents, only one occasion is referred to, which was upon a visit of one of the brothers to his parents, when defendant informed him that if he (the visiting brother) purposed to continue to harass, blame and impugn the integrity of defendant because of the conveyance of the farm to him by his parents, then he was requested to stay away from defendant and not to visit the home occupied by his parents and by him and his children.

The record as prepared and brought here contains facts—not expressly recited, but conclusively appearing "between the lines"—to the effect that the other children of plaintiffs were very much agitated over, and displeased with, the action of their parents in conveying the small farm to defendant. It furthermore appears in the same manner that the filing of this action for cancellation of the conveyance was joyfully received by them. Defendant testified that any time his parents would return to their former residence he would gladly receive them and continue to put forth his utmost endeavor to make the necessary provisions for them in conformity with the obligations of his deed. His testimony convinces us that he was firmly in earnest in making that statement, and which is fortified by his long continued conduct and services theretofore rendered.

The conclusions we have reached render it unnecessary to consider any of the questions arising upon defendant's counterclaim and, therefore, none of them will be referred to, much less determined.

Wherefore, the judgment is reversed, with directions to set it aside and to dismiss plaintiffs' petition, leaving open, of course, any cause of action that might arise for defalcations occurring in the future, if any.